A03A2428, A03A2429. McKESSON CORPORATION et al. v. GREEN et al.; and vice versa.
(597 SE2d 447)

ELLINGTON, Judge.

These cases result from a merger between two publicly traded corporations, McKesson Corporation ("McKesson"), the surviving corporation, and HBO Corporation ("HBOC"), which became a wholly owned subsidiary. Holcombe T. Green, HTG Corporation, and Hall Family Investments (hereinafter collectively referred to as the "shareholders") were shareholders of HBOC before the merger and shareholders of McKesson following the merger. In this opinion, this Court addresses two important questions, both of which appear to be of first impression to Georgia's courts.[1] In Case No. A03A2428, the issue is

---

[1] Although the merger agreement between McKesson and HBOC specified that Delaware law would govern the merger, the instant claims between McKesson and the shareholders are not controlled by that agreement, so Georgia law governs. See *McKesson HBOC, Inc. v. New*

whether McKesson waived the protection afforded its attorneys' work product when it voluntarily shared those materials with the government pursuant to a written confidentiality agreement. In Case No. A03A2429, the question is whether McKesson may maintain a suit for unjust enrichment against the HBOC shareholders, based upon its allegation that, due to HBOC's pre-merger accounting fraud, it paid the HBOC shareholders too much for their "artificially inflated" shares. For the reasons stated below, we conclude that the trial court properly granted the shareholders' motion to compel discovery of protected work product after finding that McKesson had waived its work product protection. We also find, however, that the trial court erred in denying the shareholders' motion to dismiss McKesson's unjust enrichment suit.

The relevant, undisputed facts are as follows. Before the merger, McKesson was a large, publicly traded, health care supply management company, and HBOC was a publicly traded, health care information management software company. On January 12, 1999, McKesson and HBOC merged, and HBOC became a wholly owned subsidiary of McKesson.[2] At the time of the merger, HBOC had 430 million shares of common stock outstanding.[3] Under the terms of the merger, the HBOC shareholders received 0.37 shares of McKesson common stock in exchange for each share of their HBOC common stock.

Shortly after the merger, McKesson acknowledged that HBOC had improperly recorded substantial revenue prior to the merger, which had artificially inflated HBOC's value. When McKesson issued a revised earnings statement for the previous year and publicly announced that HBOC had overstated its revenue, the value of McKesson stock plummeted. In May 1999, McKesson retained a law firm and an accounting firm to conduct an internal investigation to determine the nature and extent of HBOC's pre-merger accounting improprieties. As part of this investigation, the attorneys and accountants conducted extensive interviews of HBOC and McKesson officials, reviewed documents, and produced reports, memoranda, and other materials (hereinafter collectively referred to as the "audit documents").

---

*York State &c. Fund,* 339 F3d 1087, 1093 (II) (9th Cir. 2003) (wherein the Ninth Circuit Court of Appeals found there was no contract governing the relationship between McKesson and the former HBOC shareholders).

[2] After the merger, the surviving corporation was renamed McKesson HBOC, Inc., but it is now known as McKesson Corporation. The former HBOC subsidiary is now known as McKesson Information Solutions, Inc.

[3] *McKesson HBOC, Inc. v. New York State &c. Fund,* 339 F3d at 1094 (II) (B) (recognizing that "hundreds" of HBOC shareholders exchanged at least 20,000 shares of stock during the merger).

Within days of McKesson's public announcement, the United States Securities and Exchange Commission ("SEC") began an investigation of McKesson and HBOC to determine whether the corporations had filed materially false or misleading financial statements. The United States Attorney's Office ("USAO") also investigated several former executives of HBOC and McKesson, ultimately charging them with securities, mail, and wire fraud. See generally *United States v. Bergonzi*, 216 FRD 487 (N.D. Cal. 2003). During these investigations, McKesson voluntarily provided the audit documents to the SEC and USAO pursuant to confidentiality agreements, which stated in part that, by providing the materials to these agencies, McKesson did not waive its work product protection. See OCGA § 9-11-26 (b) (3).[4]

In the meantime, numerous McKesson shareholders across the country, including the plaintiffs in this case, filed lawsuits alleging that McKesson and HBOC had committed securities fraud. See *McKesson HBOC, Inc. v. Adler*, 254 Ga. App. 500, n. 1 (562 SE2d 809) (2002) (noting that more than 80 lawsuits arising out of the merger had been filed nationwide). The shareholders in this case alleged that they had incurred more than $100 million in stock losses as a result of the accounting fraud. In its response to this complaint, McKesson filed a counterclaim for unjust enrichment against Green and HTG Corporation as HBOC shareholders, contending that because HBOC was fraudulently overvalued at the time of the merger, the shareholders were unjustly enriched when they received more shares of McKesson stock than they were entitled to receive for their "artificially inflated" shares of HBOC stock.

During this litigation, the shareholders moved the trial court to compel McKesson to produce the audit documents that the corporation had provided to the SEC and the USAO. They claimed that McKesson had waived its work product protection when it provided the documents to the government, because there was an adversarial relationship between McKesson and the agencies. The shareholders also moved the court to dismiss McKesson's unjust enrichment counterclaim.

---

[4] Under the work product doctrine, OCGA § 9-11-26 (b) (3), a party may obtain discovery of documents prepared in anticipation of litigation or for trial by or for another party only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

After conducting oral arguments,[5] reviewing the documents at issue, and considering the parties' briefs, the trial court ruled that McKesson's audit documents were work product that should be protected from discovery under the work product doctrine. The trial court found, however, that an adversarial relationship existed between the SEC and McKesson, and that McKesson voluntarily provided its audit documents to this "adversary." Based upon these findings, the trial court concluded that McKesson had waived its work product protection.[6] Further, the trial court held that the confidentiality agreement between McKesson and the SEC in this case did not prevent a waiver of the protection. Accordingly, the trial court granted the shareholders' motion to compel discovery. This Court granted McKesson's application for interlocutory appeal, and, in Case No. A03A2428, McKesson appeals the trial court's ruling.

In the same order, the trial court denied the shareholders' motion to dismiss McKesson's unjust enrichment counterclaim, finding that McKesson had stated a viable claim for unjust enrichment. In Case No. A03A2429, the shareholders appeal the court's denial of their motion to dismiss.

## Case No. A03A2428

### Shareholders' Motion to Compel Discovery of Audit Documents

1. McKesson contends the trial court erred in finding that it had an adversarial relationship with the SEC and that it waived its work product protection when it provided the audit documents to the agency. In its ruling, the trial court relied on *McKesson HBOC, Inc. v. Adler*, 254 Ga. App. at 501 *("Adler")*, a related case in which a shareholder sought damages from McKesson after the merger with HBOC. In *Adler*, this Court considered whether McKesson waived its attorney/client privilege and work product protection when it turned over its internal audit documents to the SEC. Id. This Court noted that the level of protection for work product is very high, and that the materials are discoverable only under limited circumstances after the party moving to compel discovery demonstrates a substantial need for the evidence and that undue hardship will result absent discovery. Id. at 502 (1); see also OCGA § 9-11-26 (b) (3). Further, if the trial court determines that the materials are protected by the work product doctrine, it must also consider whether the party for which

---

[5] No transcript of the hearing appears in the record on appeal.

[6] The trial court did not rule on whether McKesson waived the privilege when it provided audit documents to the USAO.

the materials were prepared waived its protection. *McKesson HBOC, Inc. v. Adler*, 254 Ga. App. at 502 (1). Recognizing that the purpose behind the work product protection was to "protect[ ] the adversarial system by allowing attorneys to prepare cases without concern that their work will be used against their clients," this Court held that the protection is not waived by the voluntary disclosure to a third party, unless the third party was an adversary or otherwise enabled an adversary to gain access to the information. Id. at 503 (1).[7]

McKesson contends the trial court erred in finding that it had an adversarial relationship with the SEC. McKesson argues, instead, that it cooperated with the agency with the "common interest" of determining whether any HBOC personnel had violated securities laws prior to the merger or had violated their duties to the corporation or the public. A transfer of documents to a party with "strong common interests"[8] in sharing the work product, or a transfer made with a guarantee of confidentiality, does not waive the work product protection. See *United States v. Gulf Oil Corp.*, 760 F2d 292, 296 (II) (Temp. Emer. Ct. App. 1985) (finding that the parties were not adversaries at the time of disclosure; therefore, there was no waiver of the work product protections). The corporation also contends that the fact that the SEC considered action against McKesson two years after the materials were shared did not make them an "adversary" for purposes of waiving the work product protection. Further, the corporation argues that the SEC's investigation was later "terminated" without any enforcement action, therefore supporting a finding that there was no adversarial relationship.[9]

In response to McKesson's arguments, the shareholders contend that an adversarial relationship — or the potential for such a relationship — existed between the SEC and McKesson when McKesson voluntarily shared the audit documents with the agency.[10] Disclosure

---

[7] The trial court in *Adler* did not decide whether McKesson's disclosure to the SEC constituted a waiver of the work product protection. *McKesson HBOC, Inc. v. Adler*, 254 Ga. App. at 504 (1). Therefore, this Court remanded the case back to the trial court for a finding on this issue. Id. The *Adler* case settled before the trial court decided the waiver issue.

[8] The "common interest" privilege, also known as the joint defense privilege, applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived. The privilege does not require a complete unity of interests among the participants, and it may apply where the parties' interests are adverse in substantial respects.
(Citations omitted.) *United States v. Bergonzi*, 216 FRD at 495 (II) (A) (2) (b) (1).

[9] In its amicus brief to this Court, the SEC declined to take a position on whether it was at any time adverse to McKesson or whether the common interest exception to the waiver doctrine applied in this case.

[10] See *United States v. Bergonzi*, 216 FRD at 496-498 (II) (A) (2) (b) (1) (a criminal case involving former HBOC and McKesson executives, wherein the court found as a matter of fact

to an adversary, *real or potential*, forfeits the work product protection. *United States v. Massachusetts Institute of Technology*, 129 F3d 681, 687 (1st Cir. 1997) (finding a waiver of work product protection because there was the "potential for dispute and . . . litigation" between the parties). And making any disclosure that is inconsistent with maintaining secrecy from an adversary or that increases the chance that the material will be obtained by an adversary will also waive the work product protection. Id.; *Saito v. McKesson HBOC, Inc.*, 2002 Del. Ch. LEXIS 125, at 13. In short, once a party gives an adversary access to the protected thought processes of counsel, the need for the work product protection disappears. *In re Steinhardt Partners*, 9 F3d 230, 235 (2nd Cir. 1993).

The record evidence in this case that supports a finding of an actual or potential adversarial relationship between McKesson and the SEC includes the following: On April 28, 1999 — three months after the merger and just days after McKesson restated its earnings and disclosed HBOC's accounting improprieties — the SEC began an informal inquiry to investigate the facts which led to the restatements and to determine whether McKesson had filed materially false or misleading statements of its financial condition. In July 1999, the SEC issued an order directing an investigation of McKesson for securities fraud, falsifying records, and other violations. A year later, the SEC filed complaints against McKesson and HBOC executives which alleged that HBOC had been involved in securities fraud that began at HBOC in 1997 and that the fraud continued at McKesson after the merger. The complaints also alleged that the financial statements of both corporations were "materially false and misleading" between January 1998 and April 1999. After the SEC completed its investigation of McKesson in June 2001, the agency notified the corporation that it intended to recommend that its staff initiate a cease-and-desist proceeding against the corporation based upon allegations that McKesson violated various federal securities laws. Finally, regarding McKesson's contention that the SEC later terminated its investigation without any enforcement action, the record shows that this "termination" was not to be construed as indicating

---

that McKesson and the government were adversaries and did not share a "true common goal" during the post-merger investigation, as it could not have been McKesson's goal to impose liability onto itself); *McKesson HBOC, Inc. v. Superior Court of San Francisco County*, 115 Cal. App. 4th 1229, 1240 (9 Cal. Rptr.3d 812) (2004) (finding that McKesson and the government were not aligned in any litigation and did not share the same stake or have the same goal); *Saito v. McKesson HBOC, Inc.*, 2002 Del. Ch. LEXIS 125, at 16-20 (a shareholder suit in which the trial court found that McKesson did not share a common interest with the SEC at the time the documents were disclosed, that the SEC was a "foe" of the corporation, and that McKesson was aware that an adversarial relationship existed before disclosing its work product).

McKesson had been exonerated or that the SEC would not pursue actions against the corporation in the future.

In addition, the shareholders contend that McKesson disclosed the audit documents in order to gain leniency from the SEC, not because there was a shared common interest.[11] In its amicus brief to the trial court, the SEC admitted that it "often rewards cooperation [by the subject of the investigation] with lenient treatment." See *In re Subpoenas Duces Tecum*, 738 F2d 1367, 1369 (I) (D.C. Cir. 1984) (recognizing that the SEC's "voluntary disclosure program . . . promises wrongdoers more lenient treatment and the chance to avoid formal investigation and litigation in return for thorough self-investigation and complete disclosure of the results to the SEC") (citation and punctuation omitted).

Having considered the arguments and evidence presented, the trial court found that McKesson and the SEC were adversaries. Because the trial court is the trier of fact in discovery disputes and there is evidence in the record to support the court's finding, it is not clearly erroneous. *McKesson HBOC, Inc. v. Adler*, 254 Ga. App. at 504 (1). Further, based upon this finding of an adversarial relationship, we agree with the court's conclusion that McKesson waived its work product protection when it voluntarily shared the audit documents with the SEC.[12] See *United States v. Bergonzi*, 216 FRD at 498 (II) (A) (2) (b) (2) (McKesson's disclosure of documents to an adversary constituted a waiver of the work product protection); *McKesson HBOC, Inc. v. Superior Court of San Francisco County*, 115 Cal. App. 4th 1229, 1241 (9 Cal. Rptr.3d 812) (2004) (accord).

2. McKesson also contends that, even if it turned over its protected documents to an "adversary," the trial court erred in concluding that confidentiality agreements between McKesson and the SEC and USAO did not prevent a waiver of its work product protection. The May 1999 confidentiality agreements at issue recognized that having access to the audit documents "may assist the [SEC and USAO] in carrying out [their] law enforcement responsibilities." The

---

[11] See *In re Steinhardt Partners*, 9 F3d at 235-236 (noting that the SEC has continued to receive voluntary cooperation from subjects of investigations even absent the promise of confidentiality, because such cooperation benefits the subject by providing the possibility of leniency and limiting the duration and parameters of the investigation and resulting litigation); *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F2d 1414, 1429 (V) (3rd Cir. 1992) (finding that when a party discloses protected materials to a government adversary in order to forestall prosecution or obtain lenient treatment, such disclosure waives the work product protection because both objectives are "foreign" to the rationale behind the work product doctrine); see also *In re: Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F3d 289, 306-307 (II) (6th Cir. 2002) (noting that the decision on whether to " 'show your hand' " by disclosing work product is a "quintessential litigation strategy").

[12] Having found a waiver, the trial court did not address the issues of substantial hardship or undue burden.

agreements also stated that, in providing the audit documents, McKesson did not intend to waive the protections of the work product doctrine or any other applicable protection.

The shareholders argue, however, that the agreements did not ensure that the work product would remain confidential, because the agreements allow the government to disclose the materials to other entities "as it sees fit," making the agreements "illusory." For example, the SEC agreement allowed the SEC to disclose the documents to others if it determined that disclosure was required by federal law or was "in furtherance of the [SEC's] discharge of its duties and responsibilities."[13] Similarly, the USAO agreement allowed the disclosure of the materials as it "deems appropriate" during "any criminal investigation or prosecution, *including any prosecution of [McKesson]*." (Emphasis supplied.)[14]

Therefore, the record shows that the confidentiality agreements between McKesson and the government in this case did not insure that the materials would, in fact, remain confidential.[15] We agree with the trial court's conclusion that the confidentiality agreements in this case did not prevent a waiver of McKesson's work product protection. See *United States v. Bergonzi*, 216 FRD at 496-497 (II) (A) (2) (b) (1), n. 10 (finding that the confidentiality agreements between McKesson and the government were not unconditional, gave the government the power to share the documents as "it saw fit," and therefore did not prevent a waiver of the work product protection); *McKesson HBOC, Inc. v. Superior Court of San Francisco County*, 115 Cal. App. 4th at 1239-1240 (accord); cf. *Jobin v. Bank of Boulder*, 161 BR 689, 696 (III) (B) (3) (D. Colo. 1993) (finding no waiver of attorney/client privilege when the disclosing party had a mandatory duty to cooperate in the reporting and prosecution of financial

---

[13] In fact, in its amicus brief to this Court, the SEC admits that it may, in the future, disclose some of the documents during ongoing litigation, and that this may cause McKesson to lose its work product protection.

[14] According to the agreement, the USAO would treat the audit documents as grand jury materials subject to disclosure to government attorneys and other personnel in the performance of their duty to enforce federal criminal law, including disclosure to other federal grand juries and as part of other investigations. See Federal Rules of Criminal Procedure, Rule 6 (e) (3).

[15] In fact, the record shows that, during the *Adler* litigation, the USAO inadvertently sent some of the audit documents to attorneys representing other adverse parties, and that these attorneys reproduced the documents, gave them to experts, and otherwise incorporated them into the case preparation. When the USAO demanded the return of the documents, one of the attorneys contended that the production of the documents effected a waiver of the work product protection, and the USAO abandoned its demand.

Further, subsequent to the trial court's April 2003 ruling, McKesson admitted to this Court that its attorneys had shared the "substance" of some of the work product at issue with three former executives – including a former McKesson Chairman – who are co-defendants in some of the civil actions pending against the corporation. There is nothing in the record which indicates that these parties agreed to keep this information confidential.

institution crimes under the Federal Reserve System Procedures, as compared to a disclosure pursuant to the SEC's voluntary disclosure program). Accordingly, the trial court did not abuse its discretion in granting the shareholders' motion to compel discovery. *Reeder v. Gen. Motors Acceptance Corp.*, 235 Ga. App. 617, 620 (3) (510 SE2d 337) (1998) (given the trial court's broad discretion in ruling on discovery matters, this Court will not interfere with such rulings absent an abuse of discretion).

*Case No. A03A2429*

*Shareholders' Motion to Dismiss McKesson's Unjust Enrichment Counterclaim*

3. The shareholders contend the trial court erred in denying their motion to dismiss McKesson's unjust enrichment counterclaim, arguing that Georgia's courts should not allow McKesson to maintain a suit to recover against HBOC's former shareholders on an unjust enrichment theory based simply upon an allegation that HBOC's stock was fraudulently overvalued at the time of the merger. See OCGA § 9-11-12 (b) (6). "A motion to dismiss may be granted only where a complaint shows with certainty that the plaintiff would not be entitled to relief under any state of facts that could be proven in support of his claim. Our review is de novo." (Citation, punctuation and footnotes omitted.) *Smith Svc. Oil Co. v. Parker*, 250 Ga. App. 270 (549 SE2d 485) (2001).

In considering this issue, we are persuaded by a recent opinion of the United States Court of Appeals for the Ninth Circuit, which addressed this exact issue of whether McKesson could sue HBOC shareholders under a theory of unjust enrichment. *McKesson HBOC, Inc. v. New York State &c. Fund*, 339 F3d 1087.[16] In that case, the Ninth Circuit Court upheld the lower federal court's dismissal of McKesson's unjust enrichment claims against shareholders arising from the same merger, concluding that

> [t]he sanctity of the corporate entity, as well as the policies militating against subjecting individual shareholders of a public company to liability for a merger gone bad, defeat McKesson's effort to turn corporate law inside out. We emphasize that unjust enrichment is an equitable remedy; we cannot countenance the inequity wrought by McKesson's

---

[16] The case of *McKesson HBOC, Inc. v. New York State &c. Fund*, supra, had not yet been decided when the trial court issued its ruling in this case.

efforts to hold the shareholders liable for alleged corporate fraud.

Id. at 1093 (II). In reaching this conclusion, the Ninth Circuit made the following observations:

[P]ermitting [McKesson's] suit and exposing the shareholders to liability would effect an unprecedented piercing of the corporate veil. . . . McKesson's effort to characterize a suit against the corporation as a de facto suit against the shareholders because of potential diminution in equity ignores a core concept: corporate liability is not the same as shareholder liability. The corporate form protects shareholders by limiting their liability and their direct control over the corporation. Indeed, courts are reluctant to disregard the separate existence of related corporations by piercing the corporate veil, and have consistently given substantial weight to the presumption of separateness. The corporate entity may be disregarded only in exceptional circumstances.

(Citations and punctuation omitted.) Id. at 1094 (II) (B). See also *Garrett v. Women's Health Care of Gwinnett*, 243 Ga. App. 53, 55-56 (2) (532 SE2d 164) (2000) ("A corporation is a separate legal entity, and great caution should be exercised before disregarding this separateness.") (footnote omitted). In Georgia, these exceptional circumstances include evidence of shareholder control of the corporation, such disregard for the corporate form as to make the corporation a mere sham or a business conduit for the shareholder personally, or manipulation of the corporation by the shareholder in order to commit fraud or evade statutory, contractual, or tort liability. Id. at 56 (2); *J & J Materials, Inc. v. Conyers Seafood Co.*, 214 Ga. App. 63, 65 (4) (446 SE2d 781) (1994). "In order to justify the disregard of the corporate entity, there must be evidence that the corporate form has been abused." (Footnote omitted.) *Garrett v. Women's Health Care of Gwinnett*, 243 Ga. App. at 56 (2).

In this appeal, McKesson argues that it should be allowed to recover from Holcombe Green because he was not a "typical" shareholder, but had served as the Chairman of HBOC's Board of Directors until February 1998. The counterclaim, however, does not allege any acts arising to abuse or disregard of the corporate form by Green or any other shareholder, alleging only that Green, as the HBOC Board of Directors Chairman, "either knew or should have known of the alleged fraudulent conduct that occurred on his watch." But the unjust enrichment counterclaim in this case is against Green in his

capacity as a *shareholder*, not as a former HBOC official.[17] The counterclaim contains no allegation of *shareholder* abuse of the corporate form or manipulation of the corporation for improper purposes.

Therefore, the counterclaim fails to allege the exceptional circumstances necessary to reach the shareholders by piercing the corporate veil. *Garrett v. Women's Health Care of Gwinnett*, 243 Ga. App. at 56 (2); see *McKesson HBOC, Inc. v. New York State &c. Fund*, 339 F3d at 1095 (II) (B) (finding that McKesson had failed to allege that any HBOC shareholders exercised, or even had the ability to exercise, domination or control over HBOC, or that they manipulated HBOC to commit fraud).

Furthermore, we agree with the Ninth Circuit that the expansion of liability to the former HBOC shareholders under these circumstances would be unjust and against public policy. "Such liability was surely not within the scope of any anticipated exposure at the time of shareholder approval. . . . We are not prepared to add yet another layer of uncertainty and risk to the already complex and drawn out world of securities fraud litigation." *McKesson HBOC, Inc. v. New York State &c. Fund*, 339 F3d at 1096 (II) (B).

Based upon the persuasive authority of *McKesson HBOC, Inc. v. New York State &c. Fund*, we decline to expand the law governing shareholder liability to embrace the claim asserted here. We find that, as a matter of Georgia law, McKesson's unjust enrichment counterclaim is legally insufficient to allow it to pierce the corporate veil and reach the former HBOC shareholders. The trial court erred in denying the shareholders' motion to dismiss McKesson's counterclaim, and we remand this case to the trial court with direction to dismiss this counterclaim.

4. Given our decision in Division 3, supra, the shareholders' remaining enumerations are moot.

*Judgment affirmed in Case No. A03A2428. Judgment reversed in Case No. A03A2429 and case remanded with direction. Blackburn, P. J., and Phipps, J., concur.*

DECIDED MARCH 8, 2004 —

*Morris, Manning & Martin, Joseph R. Manning, John H. Williamson, Tara L. Adyanthaya*, for appellants.

---

[17] The Ninth Circuit Court noted that McKesson may have potential legal claims against parties who actually played a role in the merger, including HBOC officers and directors, for their intentional or negligent corporate acts prior to and during the merger. *McKesson HBOC, Inc. v. New York State &c. Fund*, 339 F3d at 1093 (II) (A).

*Bondurant, Mixson & Elmore, H. Lamar Mixson, Jason M. Freier, Jill A. Pryor*, for appellees.