10-3607-cv
Bigio v. Coca-Cola Co.

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term 2011

(Argued:  November 17, 2011             Decided: March 19, 2012)

No. 10-3607-cv

—————————————————

RAPHAEL BIGIO,
BAHIA BIGIO,
FERIAL SALMA BIGIO,
B. BIGIO & COMPANY,
*Plaintiffs-Appellants,*

-v-

THE COCA-COLA COMPANY,
THE COCA-COLA EXPORT CORPORATION,
*Defendants-Appellees.*

—————————————————

Before:  JACOBS, *Chief Judge,* CABRANES and LIVINGSTON, *Circuit Judges.*

Plaintiffs-Appellants appeal from an August 25, 2010 judgment of the United States District Court for the Southern District of New York (Jones, *J.*) granting Defendants-Appellees' motion to dismiss and denying as moot Plaintiffs-Appellants' motion for summary judgment on liability.  The District Court held that Plaintiffs-Appellants failed to state a claim, under a variety of theories, based on Defendants-

Appellees' purchase and possession of an interest in the Coca-Cola Bottling Company of Egypt. This appeal followed.

Affirmed.

NATHAN LEWIN (Alyza D. Lewin, Lewin & Lewin, LLP, Washington, DC, Sherrie Savett, Arthur Stock, Douglas M. Risen, Shoshana Savett, Berger & Montague, PC, Philadelphia, PA, *on the brief*), Lewin & Lewin, LLP, Washington, DC, for *Plaintiffs-Appellants*.

RICHARD A. CIRILLO (Paul A. Straus, Kristi E. Jacques, Kana A. Ellis, *on the brief*), King & Spalding LLP, New York, NY, for *Defendants-Appellees*.

LIVINGSTON, *Circuit Judge*:

This case, here on its third visit to this Court, asks us to determine whether Plaintiffs-Appellants ("Plaintiffs") have stated a cause of action against two American corporations that, in 1994, acquired an interest in an Egyptian corporation which allegedly wrongfully possesses property expropriated from Plaintiffs in Egypt by the Nasser regime in the 1960s. For the reasons that follow, we hold that they have not. We therefore affirm the judgment of the District Court dismissing the complaint for failure to state a claim.

# I. BACKGROUND

*A.  Factual Allegations*

For the events giving rise to this case we must look back nearly a century, to 1929, when Raphael Nessim Bigio, father-in-law of Plaintiff Bahia Bigio and grandfather of Plaintiffs Raphael Bigio and Ferial Salma Bigio, purchased real property in the Egyptian city of Heliopolis, a suburb of Cairo.[1]  He made additional purchases of land in 1942 and 1946.  Beginning in the 1940's, the Coca-Cola Company ("Coca-Cola") leased land and buildings from Raphael Nessim Bigio's family ("the Bigios" or "the Bigio family") to establish its first bottling plant in Egypt.  The Bigios' manufacturing companies, R.N. Bigio & Co. and B. Bigio & Co., also manufactured various products for Coca-Cola, including serving trays, bottle coolers, and bottle caps.

Beginning in 1962, the Egyptian government sequestered and then nationalized real property, business entities, and chattels belonging to Raphael Nessim Bigio's son Josias Bigio and his family, including the land on which Coca-Cola operated its bottling plant, the Bigios' factory equipment, and the manufacturing companies R.N. Bigio & Co. and B. Bigio & Co.  Josias Bigio and his family were Jewish, and Plaintiffs allege that the Egyptian government's sequestration and nationalization of the Bigios' property were the product of "the anti-Jewish policies of its then President Gamal Abdel Nasser."  Am. Cmplt. at ¶ 17.  At first, the Bigio family's real property was

---

[1] A more detailed summary of relevant background information can be found in our first decision in this case, *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 444-46 (2d Cir. 2000) ("*Bigio I*").  Unless otherwise indicated, the facts set forth herein are taken from the Plaintiffs' Amended Complaint, which, as discussed below, we accept as true for present purposes.

3

administered directly by the Egyptian Ministry of Finance. It later came into the possession of the Misr Insurance Company, an entity wholly owned by the Egyptian government. The businesses, factories, and equipment formerly possessed by the Bigios were consolidated with other nationalized bottling companies into a single entity doing business under the name "El Nasr Bottling Company" ("ENBC"), which operated on the real property formerly held by the Bigios.[2] Plaintiffs allege that Coca-Cola knew at the time that the property at issue had been unlawfully taken and that it nevertheless continued to do business with ENBC. In 1965, the Bigio family was expelled from Egypt. They eventually settled in Canada.

In 1979, Plaintiff Raphael Bigio returned to Egypt for a period of time. While there, he obtained decrees from the Egyptian Ministry of Finance to the effect that the land belonging to Bahia Bigio, Raphael Bigio's mother, "had never been legally sequestered or nationalized and accordingly remained" hers, and that the Bigios' other real property "had been sequestered pursuant to an invalid [d]ecree, and must be returned to the heirs of Josias Bigio." Am. Cmplt. at ¶ 31. Although the Egyptian Ministry of Finance ordered the Misr Insurance Company "to return possession of the

---

[2] Plaintiffs contend that a sequestration order was never issued for a parcel of land owned by Bahia Bigio, but that the land was nevertheless occupied by forces of the Egyptian government. The Amended Complaint at one point alleges that the "buildings owned by Bahia Bigio which were never subjected to legal sequestration" were not consolidated into ENBC. Am. Cmplt. at ¶ 24. However, the Amended Complaint also asserts that B. Bigio & Co. was "sequestered and then nationalized," and Plaintiffs argue before us that Bahia Bigio's property is currently occupied by the Coca-Cola Bottling Company of Egypt, which is, as explained below, ENBC operating under a new name. Resolution of this seeming inconsistency is not material to our decision in this case.

4

property to the Bigios," Am. Cmplt. at ¶ 32, the company refused to do so. Efforts in the Egyptian legal system to enforce the Ministry of Finance's decrees have thus far proven unsuccessful.

In 1993, the Egyptian government announced the privatization of ENBC. In February 1994, Raphael Bigio notified Coca-Cola of the Bigio family's claims to certain property currently in the possession of ENBC. Officers of Coca-Cola scheduled a meeting with Raphael Bigio, but before the scheduled date of the meeting Coca-Cola closed on a transaction whereby it acquired an ownership interest in ENBC. Specifically, a consortium including two Coca-Cola subsidiaries acquired a 42% interest in ENBC, and a joint venture between Coca-Cola and MAC Beverages acquired another 53%. The total price paid for ENBC by all buyers was $96 million.[3] Sometime after the close of the transaction, ENBC was renamed the Coca-Cola Bottling Company of Egypt ("CCE").

Since 1994, Coca-Cola has continued at all times to hold an ownership interest in CCE. CCE has constructed additional buildings on the land formerly owned by the Bigio family. CCE continues to bottle Coca-Cola products in Egypt, and Coca-Cola profits from sales of syrup and licensing agreements to CCE. Coca-Cola also profits from sales of CCE stock, selling a 5% interest in CCE for $24 million in 1999.

---

[3] The Amended Complaint alleges that "[t]he bidders agreed to invest an additional $148 million into the newly reorganized company over ten years." Am. Cmplt. at ¶ 34. It is unclear whether the term "[t]he bidders" refers to the entities that successfully acquired an interest in ENBC or to all entities that attempted to acquire such an interest. The difference between these two possible meanings is not material to our assessment of the case.

*B.*     *Procedural History*

The Plaintiffs are Raphael Bigio (Ferial Salma Bigio's brother, Josias Bigio's son, and Raphael Bigio's grandson), Ferial Salma Bigio (Raphael Bigio's sister, Josias Bigio's daughter, and Raphael Nessim Bigio's granddaughter), Bahia Bigio (Josias Bigio's wife and Raphael Bigio and Ferial Salma Bigio's mother), and B. Bigio & Co. (a corporation allegedly owned by the foregoing "Individual Plaintiffs"). The Individual Plaintiffs claim to be the present owners of property taken from the Bigio family in the 1960s or of interests therein. In 1997, Plaintiffs filed a complaint in the United States District Court for the Southern District of New York. They brought suit against Coca-Cola and a wholly-owned subsidiary of Coca-Cola, the Coca-Cola Export Corporation[4] (collectively "Defendants"), but not against CCE, the Misr Insurance Company, or the Arab Republic of Egypt. Defendants moved to dismiss the complaint for, *inter alia*, lack of subject matter jurisdiction, or in the alternative for summary judgment. The District Court (Martin, *J.*) granted the motion to dismiss on the grounds that jurisdiction under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, was lacking and that the act of state doctrine barred the exercise of jurisdiction under 28 U.S.C. § 1332. *Bigio v. Coca-Cola Co.*, No. 97 Civ. 2858 (JSM), 1998 WL 293990 (S.D.N.Y. June 5,

---

[4] The role of the Coca-Cola Export Corporation in this lawsuit is unclear. It is mentioned only once by name in the Amended Complaint, and then only to note that it is a wholly-owned subsidiary of Coca-Cola and organized under the laws of Delaware. However, the Amended Complaint alleges that Coca-Cola "and its affiliates" undertook the tortious actions described therein. We assume for purposes of this decision that the phrase "its affiliates" refers to the Coca-Cola Export Corporation and therefore treat the Amended Complaint's allegations against Coca-Cola as directed against the Coca-Cola Export Corporation as well.

1998). Plaintiffs appealed to this Court. We agreed that jurisdiction was unavailable under the ATS but reversed the District Court's determination that jurisdiction under 28 U.S.C. § 1332 was precluded by the act of state doctrine. *Bigio I*, 239 F.3d at 443-44. We remanded for determination as to whether "principles of international comity" prohibited jurisdiction over the case. *Id.* at 456.

On remand, the District Court (Jones, *J.*) held that international comity and the *forum non conveniens* doctrine required dismissal of the case. *Bigio v. Coca-Cola Co.*, No. 97 Civ. 2858 (BSJ), 2005 WL 287397, at *7 (S.D.N.Y. Feb. 3, 2005). We reversed the District Court on both grounds and remanded for further proceedings. *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178-80 (2d Cir. 2006) ("*Bigio II*").

In August 2009, Plaintiffs filed an Amended Complaint alleging the following five causes of action: 1) "unlawful taking and exclusion of plaintiffs," 2) trespass, 3) conversion, 4) civil conspiracy and aiding and abetting,[5] and 5) unjust enrichment. Defendants moved to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim and on the theory that the claims were time-barred, and Plaintiffs cross-moved for summary judgment on the issue of liability. The District Court (Jones, *J.*) granted Defendants' motion and denied Plaintiffs' as moot. *Bigio v. Coca-Cola Co.*, No. 97 Civ. 2858 (BSJ), 2010 WL 3377503, at *9 (S.D.N.Y. Aug. 23, 2010).

In the District Court's view, the first count was "substantially similar" to the ATS claim that appeared in the original Complaint, the dismissal of which was

---

[5] The Amended Complaint also alleges some facts consistent with a principal-agent theory of liability, and Plaintiffs argue such a theory before us.

7

affirmed by this Court in *Bigio I*. *Id*. at *2. Turning to the trespass claim, the District Court held that Egyptian law applied, since the real property in question is in Egypt. *Id*. at *3-4. Comparing the affidavits on Egyptian law submitted by the parties, the District Court credited the opinion of Defendants' expert (that occupying real property pursuant to a "claim of right" precludes liability for trespass under Egyptian law) over the opinion of Plaintiffs' expert (that liability for trespass attached because Defendants "knew or should have known that ownership of the land was in dispute"). *Id*. at *4-5 (internal quotation mark omitted). The District Court offered two reasons for this choice: 1) only Defendants' expert is licensed to practice law in Egypt; and 2) Plaintiffs' expert offered a "conclusory, partisan statement" that Defendants committed trespass "despite the existence of a lease or other claim of right," while Defendant's expert provided a "succinct statement of Egyptian law." *Id*. at *5. Noting that the Amended Complaint admits that "the Bigios' properties were sold or leased to the Defendants," the District Court held that Defendants occupied the real property in question pursuant to a claim of right, and therefore liability for trespass could not attach. *Id*. at *6 (emphasis and internal quotation marks omitted).[6]

Moving to the balance of the Amended Complaint, the District Court dismissed the conversion claim principally on the basis of the assertion of Defendants' expert that, under Egyptian law, "acquiring stock in a joint stock company like ENBC does

---

[6] Given our alternative basis for concluding that Plaintiffs' trespass claim was properly dismissed, *see infra at* pp. 12-14, we do not address Plaintiffs' argument that the District Court improperly credited the Defendants' expert and erred in accepting his conclusions regarding the scope of trespass liability under Egyptian law.

not constitute a trespass to personal property that is occupied or held by the joint stock company."[7]  *Id.* at *7.  It dismissed the claim for civil conspiracy and aiding and abetting because there was no underlying tort to support secondary liability and also because any allegations that Defendants controlled ENBC's operations failed to meet the pleading standard articulated by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009). *Bigio*, 2010 WL 3377503, at *8.  Finally, the District Court dismissed the unjust enrichment claim because 1) the claim for unjust enrichment is duplicative of Plaintiffs' other claims; 2) "Plaintiffs have not plausibly alleged that Defendants enriched themselves without just cause"; and 3) "Plaintiffs have not alleged that Defendants' purchase of shares of Coca-Cola Egypt caused any loss to Plaintiffs." *Id.*  Because the District Court granted Defendants' motion to dismiss in its entirety, it denied Plaintiffs' motion for summary judgment as moot. *Id.*

Judgment was entered for Defendants on August 25, 2010, and this appeal followed.

## II.  DISCUSSION

*A.    Standard of Review*

This Court reviews *de novo* a dismissal pursuant to Fed. R. Civ. P. 12(b)(6), "accept[ing] all well-pleaded allegations in the complaint as true [and] drawing all reasonable inferences in the plaintiff's favor."  *Operating Local 649 Annuity Trust*

---

[7] To the extent that the conversion claim included real property in its ambit, the District Court dismissed on the ground that such property was not the appropriate subject of a conversion claim and that it fell within the scope of Plaintiffs' trespass claim. *Bigio*, 2010 WL 3377503, at *7.

*Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010). "We may affirm a district court's dismissal of a complaint on any basis supported by the record." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Our review of the District Court's interpretation of foreign law is *de novo, see Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009), as is our review of the District Court's choice of law, *see Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 137 (2d Cir. 2011).

*B.     Choice of Law*

The parties hotly dispute the governing law to apply in this case. In cases where jurisdiction is based on the diversity of the parties' citizenship, a federal court will apply the choice-of-law rules of the forum state, which is New York in this instance. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 419 (2d Cir. 2001). "Under the doctrine of depecage as applied by New York courts, the rules of one legal system are applied to regulate certain issues arising from a given transaction or occurrence, while those of another system regulate other issues." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 397 n.1 (2d Cir. 2001) (internal quotation marks omitted). Three different bodies of law are potentially applicable in this case: the law of New York, the forum state; the law of Georgia, the state in which Coca-Cola's headquarters are located; and the law of Egypt, the jurisdiction where the property in question is located. We conduct the choice-of-law analysis separately for each of the Plaintiffs' claims. *See GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 383 (2d Cir. 2006).

*C.*     *Merits*

*1.*     *Count One*

The District Court concluded that Plaintiffs' claim for "unlawful taking and exclusion" essentially restates the ATS claim in Plaintiffs' original complaint, the dismissal of which this Court affirmed in *Bigio I*, 239 F.3d at 447-49.[8] On appeal, Plaintiffs argue that Count One is critically distinct from the claim we earlier dismissed. Rather than "claim[ing] that Coca-Cola is responsible for the expulsion of the Bigios from their properties or that Coca-Cola was a party to the violations of international law committed by Nasser's Egyptian government," Appellant's Br. at 21, Plaintiffs characterize Count One as alleging that Coca-Cola "occup[ied] [their] property following Egypt's violation of the Law of Nations and . . . continued [to exploit] the property without compensating the Bigios," *id.* at 22. For the proposition that Count One states a separate actionable claim, Plaintiffs cite *Bigio I*, in which we stated that the "heart of the Bigios' complaint" was "the allegedly unlawful taking and refusal to return their property and refusal to compensate them for the taking of the property, all because of their religion," 239 F.3d at 450. Appellants' Br. at 21.

Plaintiffs misread *Bigio I*. As the District Court properly noted, *see Bigio*, 2010 WL 3377503, at *2 n.2, in that opinion we did not create a new cause of action for "unlawful taking"; rather, we simply took note of the factual allegations that constituted the Bigios' original complaint, en route to determining whether those

---

[8] The District Court thus dismissed Count One without performing a choice-of-law analysis.

11

allegations were "local" or "non-local" for purposes of the "local action" doctrine. *See Bigio I*, 239 F.3d at 450-51. Plaintiffs cite no authority from any American jurisdiction or from Egypt upholding a claim for "unlawful taking and exclusion." The cases Plaintiffs do cite are either clearly inapposite, *see Vineberg v. Bissonnette*, 529 F. Supp. 2d 300, 306-08 (D.R.I. 2007) (addressing replevin claim, inapplicable here because Plaintiffs do not seek return of their allegedly unlawfully expropriated property, *see id.* at 306); *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1202-03 (C.D. Cal. 2001) (addressing exception to the Foreign Sovereign Immunities Act's rule of immunity), or discuss claims sounding in conversion, which is the subject of the third count of Plaintiffs' Amended Complaint, *see Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 466-67 (S.D.N.Y. 2009) (addressing claims for conversion and replevin); *Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157, 1178 (C.D. Cal. 2006) (addressing claims for conversion, replevin, and constructive trust).

In short, there is no claim for "unlawful taking and exclusion." To the extent Count One states a claim sounding in trespass or conversion, such a claim is identical to the claims brought in other counts of the Amended Complaint, and our analysis of those other counts (including the choice-of-law analysis) will apply equally to Count One.

### 2. Counts Two and Three

We address Counts Two and Three, which allege claims sounding in trespass and conversion respectively, simultaneously because they both suffer from the same fatal defect. Plaintiffs are not suing CCE in this action. Rather, they are suing Coca-

12

Cola and one of its wholly-owned subsidiaries. The Amended Complaint, however, is unequivocal that any actions that might constitute trespass or conversion subsequent to Defendants' acquisition of an interest in CCE in 1994 were directly undertaken by CCE and not by Defendants. Under the law of New York and Georgia, the holder of an ownership interest in a corporation cannot be held liable on that basis for the corporation's torts. *See Billy v. Consol. Mach. Tool Corp.*, 412 N.E. 2d 934, 941 (N.Y. 1980) ("As a general rule, the law treats corporations as having an existence separate and distinct from that of their shareholders and consequently, will not impose liability upon shareholders for the acts of the corporation." (citation omitted)); *Garrett v. Women's Health Care of Gwinnett, P.C.*, 532 S.E. 2d 164, 168 (Ga. Ct. App. 2000) ("One who deals with a corporation . . . cannot, in the absence of fraud, deny the legality of the corporate existence for the purpose of holding the owner liable." (internal quotation marks omitted)). Furthermore, Defendants' expert affirmed (and Plaintiffs' expert did not contradict)[9] that Egyptian law also precludes liability of a corporation's shareholders for the torts of the corporation. *See* Straus Decl., Ex. D., Third Supp. Decl. of Ahmed G. Abou Ali at 3 ("Ali Decl.") ("[U]nder Egyptian law, acquiring shareholders are not liable for any torts . . . committed by a joint stock company . . . the shares of which they acquire."). Plaintiffs fail to plead any facts suggesting that this Court should pierce the corporate veil separating Defendants from CCE; indeed,

---

[9] As noted *supra* note 6, we do not reach the question whether the District Court improperly credited Defendants' expert over Plaintiffs'. Thus, we only rely on the experts' assertions regarding Egyptian law to the extent the experts agree or the assertion of one expert is uncontradicted by neither the other expert nor the opposing party.

13

Plaintiffs disclaim any attempt to pierce CCE's veil. Appellants' Br. at 37. And because there is no conflict among the laws of New York, Georgia, and Egypt on the question before us, we need not determine which body of law New York choice-of-law rules require us to apply to Counts Two and Three. *See, e.g.*, *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005) ("[W]e [do] not have occasion to embark on a choice-of-law analysis in the absence of an actual conflict between the applicable rules of two relevant jurisdictions." (internal quotation marks omitted)).

Defendants cannot be held primarily liable for the acts of CCE. Whether it can be held secondarily liable is the question to which we now turn.

*3. Count Four*

Count Four alleges that Defendants "conspired with and aided and abetted their subsidiaries and affiliates . . . in the [commission of the wrongs alleged in Counts One through Three] in order to benefit the Defendants and with knowledge of the commission of these unlawful acts." Am. Cmplt. at ¶ 56. Neither party explicitly addresses what body of law this Court should apply to assess whether Count Four states a claim. Because, as we show below, the law of New York, Georgia, and Egypt (insofar as the parties have made us aware of Egyptian law) would result in the same outcome with regard to Count Four, we need not conduct a choice-of-law inquiry.

Before us, Plaintiffs argue three distinct theories of secondary liability: aiding and abetting, agency, and conspiracy. We examine each of Plaintiffs' theories in turn.

14

#### *a. Aiding and abetting*

Plaintiffs argue that Defendants may be held liable for aiding and abetting CCE's tortious conduct. Under both New York and Georgia law, aiding and abetting liability exists for trespass.[10] *See Walls v. Moreland Altobelli Assocs., Inc.*, 659 S.E. 2d 418, 421 (Ga. Ct. App. 2008) ("One who aids, abets, or incites, or encourages or directs, by conduct or words, . . . the perpetration of a trespass is liable equally with actual trespassers." (quoting *Chattahoochee Brick Co. v. Goings*, 69 S.E. 865, 868 (Ga. 1910)) (internal quotation marks omitted)); *Art Capital Grp., LLC v. Neuhaus*, 896 N.Y.S. 2d 35, 37 (App. Div. 2010) ("In general, all who aid and abet the commission of a trespass are liable . . . ." (omission in original) (quoting *Ford v. Williams*, 13 N.Y. 577, 584 (1856))). Likewise, New York recognizes liability for aiding and abetting conversion. *See Dickinson v. Igoni*, 908 N.Y.S. 2d 85, 88 (App. Div. 2010) ("New York law permits a claim for aiding and abetting conversion." (citation omitted) (internal quotation marks omitted)); *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009) (Lynch, *J.*). While Georgia courts appear never explicitly to have adopted aiding and abetting liability for conversion, Georgia law provides that "[i]n all cases, a person who maliciously procures an injury to be done to another . . . is a joint wrongdoer and may be subject to an action." Ga. Code Ann. § 51-12-30. The Georgia statute is "inclusive and not limited to particular torts," *Insight Tech., Inc. v. FreightCheck, LLC*, 633 S.E.

---

[10] The parties have not addressed the topic of whether Egyptian law recognizes aiding and abetting liability and, if so, the contours of the Egyptian doctrine. Accordingly, we deem the parties to have consented to the application of either New York or Georgia law, *see 3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 743 (2d Cir. 1999), both of which, as we have noted, render the same result here.

15

2d 373, 378 (Ga. Ct. App. 2006), so there is no reason to think that Georgia courts would not recognize aiding and abetting liability predicated on conversion.

The tests set out by New York and Georgia courts for determining aiding and abetting liability share at least one common element: they require facts giving rise to an inference that the defendant's conduct contributed in some way to the conduct constituting the primary tort.

Thus, under New York law, a plaintiff generally states a claim for aiding and abetting upon alleging facts sufficient to support an inference of "(1) the existence of a[n underlying tort]; (2) [the] defendant's knowledge of the [underlying tort]; and (3) that the defendant provided substantial assistance to advance the [underlying tort's] commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (second alteration in original) (applying this standard in the fraud context); *see also Pittman by Pittman v. Grayson*, 149 F.3d 111, 122-23 (2d Cir. 1998) (indicating that this standard applies to tort claims generally). This standard is applicable in the context of aiding and abetting conversion. *See Kirschner*, 648 F. Supp. 2d at 533. New York courts do not appear explicitly to have applied the general aiding and abetting standard in the context of secondary liability for trespass. Instead, they have noted that, to be held liable for the trespass of another, a defendant "must have . . . caused or directed another person to trespass." *Golonka v. Plaza at Latham LLC*, 704 N.Y.S. 2d 703, 706 (App. Div. 2000); *see also Axtell v. Kurey*, 634 N.Y.S. 2d 847, 848 (App. Div. 1995) ("[I]t has long been the law of this State that [defendants] are not protected from liability for a trespass committed by an independent contractor if they directed the

16

trespass or such trespass was necessary to complete the contract [with the independent contractor.]" (citing *Ketcham v. Newman*, 36 N.E. 197 (N.Y. 1894))).

Under Georgia law, a plaintiff states a claim for statutory aiding and abetting if he or she pleads facts supporting an inference of the following elements:

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's . . . duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a . . . duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's . . . duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

*Insight Tech.*, 633 S.E. 2d at 379 (footnotes omitted). Georgia courts have used a differently-worded test for determining liability for aiding and abetting trespass: "[o]ne who procures or assists in the commission of a trespass or does any act which ordinarily induces its commission is liable therefor as the actual perpetrator." *Walls*, 659 S.E. 2d at 421 (quoting *Evans v. Cannon*, 130 S.E. 76, 78 (Ga. Ct. App. 1925)) (internal quotation marks omitted); *see also id.* ("One who aids, abets, or incites, or encourages or directs . . . the perpetration of a trespass is liable equally with actual trespassers." (internal quotation marks omitted)).

While the causation required under the various New York and Georgia standards at issue may differ in some respects (an issue we need not address here), they each at a minimum require that the defendant's conduct bear some contributory relation to the primary tort. *See Kirschner*, 648 F. Supp. 2d at 533 (requiring "substantial assistance" in conversion context); *Golonka*, 704 N.Y.S. 2d at 706

17

(requiring that defendant "must have at least caused or directed another person to trespass"); *Insight Tech.*, 633 S.E. 2d at 379 (requiring that "the defendant's wrongful conduct procure[] a breach of the primary wrongdoer's . . . duty" and "proximately cause[] damage to the plaintiff" in statutory aiding and abetting context); *Walls*, 659 S.E. 2d at 421 (requiring "procure[ment] or assist[ance] in the commission of a trespass or . . . any act[ion] which ordinarily induces its commission"). Such a relationship between the Defendants' alleged conduct and the underlying primary torts is absent from the Amended Complaint. This defect is fatal to Plaintiffs' claim premised on an aiding and abetting theory.

Under *Ashcroft v. Iqbal*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 129 S. Ct. at 1949 (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Following the Supreme Court's example in *Iqbal*, we "begin [our analysis of Plaintiffs' aiding and abetting claim] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 1950.

Many of the assertions in the Amended Complaint regarding aiding and abetting fall into this category. Thus, Plaintiffs allege that "at all times since 1994 Coca-Cola . . . exercised control of [CCE's] operations," Am. Cmplt. at ¶ 37; that "Defendants conspired with and aided and abetted their subsidiaries and affiliates . . . and other entities with which they acted in concert . . . in the Unlawful Taking and Exclusion of

18

the Plaintiffs, Trespass, and Conversion . . . in order to benefit the Defendants and with knowledge of the commission of these unlawful acts," Am. Cmplt. at ¶ 56; and that "Defendants knowingly and substantially assisted the principal violations committed by their subsidiaries, affiliates, and co-conspirators," Am. Cmplt. at ¶ 60. These are just the sort of "[t]hreadbare recitals of the elements of a cause of action" and "conclusory statements," *Iqbal*, 129 S. Ct. at 1949, that do not suffice to state a claim.

The Amended Complaint does contain a few non-conclusory statements that potentially bear on aiding and abetting liability. One is that Defendants received notice, prior to acquiring an interest in ENBC, that ENBC was engaged in trespass against the Bigios. Another is that "[t]he bidders [on ENBC, including Defendants] agreed to invest an additional $148 million into the newly reorganized company [i.e., CCE] over ten years." Am. Cmplt. at ¶ 34. Additionally, the Amended Complaint alleges that Defendants sell "syrup and other products[] and licenses" to CCE. Am. Cmplt. at ¶ 36. Furthermore, Defendants admit that they "[a]dvis[ed] [CCE] how to make money." Appellee's Br. at 41. Finally, Plaintiffs call our attention to a statement in Coca-Cola's Form 10-K for 1994, in which Coca-Cola stated the following:

> Over the last decade, bottling investments have represented a significant portion of the Company's capital investments. The principal objective of these investments is to ensure strong and efficient production, distribution and marketing systems in order to maximize long-term growth in volume, cash flows and share-owner value of the bottler and the Company.
> When considered appropriate, the Company makes equity investments in bottling companies. Through these investments, the Company is able to help focus and improve sales and marketing programs, assist in the development of effective business and information systems and help establish capital structures appropriate for these

19

respective operations. For example, the joint venture known as [CCE] was formed in the second quarter of 1994 following the privatization of the Egyptian bottler, which was previously government-owned.

Affirmation of Nathan Lewin, Ex. 2, Coca-Cola Form 10-K, at 2-3.[11]

These allegations fail to state a claim for aiding and abetting trespass or conversion, since they do not support an inference that Defendants assisted or caused CCE's alleged trespass and conversion in any way. Construed most favorably to Plaintiffs, the facts alleged support the inference that Defendants engaged in action designed to promote the economic success of CCE by agreeing to invest substantially in it, by doing business with it, and by advising it on profitability; that Defendants were motivated to take these actions by a desire to increase their own profit; and that Defendants acted even in the face of knowledge of the Bigios' claim that ENBC was engaged in an ongoing trespass on their property at the time Defendants acquired an interest in it.

No facts are pled, however, suggesting that Defendants' activities assisted or caused any trespass or conversion by CCE. Plaintiffs do not allege that Defendants advised CCE to continue to trespass on the Bigios' property or to retain their chattels; that Defendants' sales of syrup and licenses to CCE prompted it to continue ENBC's alleged tortious activities; or that Defendants' acquisition of or investment in the company made it even marginally more likely that CCE would continue the occupation of the Bigios' land or possession of their personal property. In actuality, the facts pled

---

[11] We assume *arguendo* that we may properly consider the excerpt from Coca-Cola's Form 10-K.

by Plaintiffs suggest just the opposite: ENBC had been in possession of the Bigios' property for decades prior to Defendants' acquisition of an interest in the company, and there is nothing in the Amended Complaint to suggest that this state of affairs would have changed in or after 1994 had Defendants not acquired an interest or undertaken the actions alleged in the Amended Complaint. While Defendants' actions may have contributed to CCE's overall financial health, such generalized assistance is too far removed from the underlying alleged torts to satisfy any of the standards for aiding and abetting outlined above. *See Kirschner*, 648 F. Supp. 2d at 530-31, 545 (finding no aiding and abetting liability where defendant's actions increased the apparent financial health of company, enabling company to draw in assets of customers which company insiders then converted); *In re Agape Litig.*, 681 F. Supp. 2d 352, 365 (E.D.N.Y. 2010) (holding that provision of general banking services, even assuming suspicion of underlying tort, was insufficient to confer liability); *Insight Tech.*, 633 S.E. 2d at 379 (requiring that "defendant's tortious conduct proximately cause[] damage to the plaintiff" for aiding and abetting liability to attach). In short, the Amended Complaint, shorn of its conclusory allegations, makes no assertions sufficient to give rise to an inference that Defendants aided and abetted CCE's tortious conduct.

*b. Agency*

Plaintiffs next allege that Defendants may be held liable for the tortious conduct of CCE as a consequence of an asserted agency relationship between Defendants and CCE. Under the law of both New York and Georgia, principals may be held liable for torts committed by their agents when such agents act within the scope of their agency.

21

*See Osipoff v. City of New York*, 36 N.E. 2d 646, 648 (N.Y. 1941); *DDJ Mgmt., LLC v. Rhone Grp. L.L.C.*, 911 N.Y.S. 2d 7, 10 (App. Div. 2010); *Stewart v. Storch*, 617 S.E. 2d 218, 221 (Ga. Ct. App. 2005). "New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (internal quotation marks omitted). Georgia law is to the same effect. *See Barrs v. Acree*, 691 S.E. 2d 575, 578-79 (Ga. Ct. App. 2010). As for Egyptian law, Plaintiffs' expert asserted (and Defendants' expert did not contradict) that "a master shall be liable for the acts of a servant acting on behalf of the master," and "[t]he operative fact in determining whether a master/servant relationship exists is whether the master exercises actual powers of supervision and control over the servant." Walker Decl. at 5.

Plaintiffs argue that Defendants controlled the actions of CCE. As the District Court correctly noted, however, the Amended Complaint does not contain sufficient factual allegations to give rise to an inference of control. A corporate parent's ownership interest in a subsidiary, standing alone, is insufficient to demonstrate the existence of an agency relationship. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1455, 1461-62 (2d Cir. 1995) (finding no agency relationship between a parent and its wholly-owned subsidiary). Plaintiffs' assertions that Defendants invested in CCE, did (and continue to do) business with CCE, and advised CCE in some unspecified manner on the subject of profitability simply do not suggest that Defendants had the power to

22

control CCE's conduct. Indeed, these allegations amount to nothing more than the usual concomitants of the relationship between a parent and a partially-owned subsidiary.[12] We have declined to find an agency relationship in the presence of considerably more indicia of parental control. *See id.* at 1459-62 (finding no agency relationship even though parent and subsidiary utilized a centralized cash management system and parent's approval was required for subsidiary's "real estate leases, major capital expenditures, [and] negotiations for a sale of minority stock ownership," *id.* at 1459). Accordingly, Plaintiffs fail to state a claim for agency liability under either New York, Georgia, or Egyptian law.

### c. Civil conspiracy

To state a claim for civil conspiracy under New York law, a plaintiff, in addition to alleging an underlying tort, must plead facts sufficient to support an inference of the following elements: "(1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Abacus Fed.*

---

[12] Plaintiffs suggest that Defendants may be found liable for CCE's tortious conduct because Defendants ratified that conduct. Under both New York and Georgia law, ratification will only confer liability if the underlying tortious conduct "was done or professedly done on [the principal's] account." *Hamm v. United States*, 483 F.3d 135, 140 (2d Cir. 2007) (internal quotation marks omitted); *see also Witcher v. JSD Props., LLC*, 690 S.E. 2d 855, 858 (Ga. 2010) ("An act can not be subject to ratification unless done [o]n behalf of the person adopting it and attempting to ratify it." (internal quotation marks omitted)). There is no suggestion in the Amended Complaint that CCE undertook its allegedly tortious conduct on behalf, or professedly on behalf, of Defendants. The parties have not suggested that ratification may ever create an agency relationship under Egyptian law, much less under the circumstances of this case.

*Sav. Bank v. Lim*, 905 N.Y.S. 2d 585, 588 (App. Div. 2010) (internal citation omitted) (internal quotation marks omitted). Under Georgia law, "[t]he essential element of [civil] conspiracy is proof of a common design establishing that two or more persons in any manner, either positively or tacitly, arrive at a mutual understanding as to how they will accomplish an unlawful design." *Tyler v. Thompson*, 707 S.E. 2d 137, 141 (Ga. Ct. App. 2011) (internal quotation marks omitted).[13] The Amended Complaint alleges no facts suggesting the existence of an agreement between Coca-Cola and CCE to trespass on the Bigios' real property or to convert their chattels. Accordingly, Count Four fails to state a claim on a civil conspiracy theory.

*4. Count Five*

In Count Five, Plaintiffs seek to hold Defendants liable on a theory of unjust enrichment. Specifically, Plaintiffs allege that Defendants have been unjustly enriched as a result of their acquisition of shares in CCE, their sale of products and licenses to CCE, and profits accruing to them through their ownership of an interest in CCE (such as, for instance, the $24 million realized upon the 1999 sale of a 5% interest in CCE). As with Count Four, the parties do not explicitly discuss the appropriate body of law to apply to Count Five, but, also as with Count Four, New York, Georgia, and Egyptian law lead to the same result in this instance.

---

[13] Neither party has made this Court aware of Egyptian law on the subject of liability on civil conspiracy grounds, or indeed whether such liability even exists. In light of this fact, we deem the parties to have consented to the application of New York and Georgia law on this issue. *See supra* note 10.

"Under New York law, a plaintiff asserting a claim of unjust enrichment must show that the defendant was enriched at the plaintiff's expense and that equity and good conscience require the plaintiff to recover the enrichment from the defendant." *Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009) (internal quotation marks omitted). The standard in Georgia is to the same effect. *See Tuvim v. United Jewish Cmtys., Inc.*, 680 S.E. 2d 827, 829-30 (Ga. 2009) ("Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for." (internal quotation marks omitted)). Under Egyptian law, "[a] person . . . who without just cause enriches himself to the detriment of another person, is liable to the extent of his profit, to compensate such other person for the loss sustained by him . . . ." Ali Decl, at 4.

Plaintiffs argue that Defendants exposed themselves to liability by acquiring and holding shares of CCE, the value of which was increased by CCE's wrongful possession of the Bigios' real and personal property. However, this claim fails for the same reason the trespass and conversion claims fail: CCE, not Defendants, occupies Plaintiffs' alleged real estate and controls their chattels, and any "enrichment" to Defendants from CCE's tortious conduct comes as a result of their ownership of CCE stock. Any recovery under an unjust enrichment theory, as with any recovery on a trespass or conversion theory, would therefore require us to pierce the veil separating CCE and Defendants (which Plaintiffs have expressly declined to request). *See, e.g.*, *Levin v. Kitsis*, 920 N.Y.S. 2d 131, 134 (App. Div. 2011) ("The[] allegations were

25

adequate to state a cause of action against [the corporation] to recover damages for unjust enrichment. The complaint does not adequately plead this cause of action against [the corporation's owner] . . . , however, in that the plaintiffs do not allege any basis for piercing the corporate veil . . . ." (internal citation omitted)); *McKesson Corp. v. Green*, 597 S.E. 2d 447, 450, 455-56 (Ga. Ct. App. 2004) (holding that unjust enrichment suit against former shareholder of acquired corporation seeking to reclaim funds paid for shareholder's stock in excess of its true value could not proceed without piercing corporate veil); Ali Decl., at 3 ("[U]nder Egyptian law, acquiring shareholders are not liable for any . . . unjust enrichment acts or omissions committed by a joint stock company . . . the shares of which they acquire."). Accordingly, Plaintiffs have failed to state a claim for recovery under an unjust enrichment theory.

Furthermore, we do not see how Defendants' sale of products and licenses to CCE enriched Defendants at Plaintiffs' expense. Plaintiffs do not allege that they had any claim to the licenses and products sold by Defendants to CCE. Nor have they alleged facts suggesting that Defendants ever extracted more than the fair value of these licenses and products when they sold them to their partially-owned subsidiary. Assuming that Plaintiffs correctly claim rightful title to at least some of the property comprising CCE, they still have not alleged facts indicating that the value of that property has been diminished in any way by the transactions in question. Accordingly, Defendants' sale of products and licenses to CCE does not expose them to liability on an unjust enrichment theory.

### III. CONCLUSION

The facts alleged in Plaintiffs' Amended Complaint, if true, tell a tragic story of religious discrimination in Egypt in the 1960s. We understand the Bigios' desire for compensation and admire their persistence in seeking to right the wrong allegedly done them. However, that wrong, if it did indeed occur, was inflicted by the Egyptian government, Misr Insurance Company, and CCE, not by Defendants. Because the court below correctly determined that the Amended Complaint fails to state a claim against Defendants and also therefore correctly denied Plaintiffs' motion for partial summary judgment as moot, the judgment of the District Court is **AFFIRMED**.