Robert E. ROISTACHER, Plaintiff,

v.

Andre BONDI, ancillary administrator of the Estate of Lea Bondi Jaray and personally, & Edith Southwell, domiciliary administratrix of the Estate of Lea Bondi Jaray, Defendants.

No. 11 Civ. 8200(KBF).

United States District Court, S.D. New York.

Feb. 10, 2014.

Robert E. Roistacher, New York, NY, pro se.

Dean R. Nicyper, Flemming Zulack Williamson Zauderer, LLP, New York, NY, for Defendants.

### *MEMORANDUM DECISION & ORDER*

KATHERINE B. FORREST, District Judge:

In 1939 following the German annexation of Austria, a woman named Lea Bondi Jaray was forced to surrender to a Nazi agent a painting by Egon Schiele called "Portrait of Wally." At the conclusion of the war, the painting was obtained by the Austrian government and eventually, the Leopold Museum in Vienna.

In October 1997, the painting made its way to New York for an exhibition at the Museum of Modern Art ("MoMA"), and on December 24, 1997, *The New York Times*

published an article about the painting and its unusual history. Later that same day, Lea Bondi Jaray's family took their first steps in what would become a 13–year battle to regain their ownership rights over the painting; on July 20, 2010, Lea Bondi Jaray's estate settled with the Leopold Museum for $19 million.

Soon after the settlement was finalized, on November 14, 2011, Robert Roistacher (hereinafter, "plaintiff")—who was dating Ardith Bondi, a member of the family, in 1997 and 1998 [1]—filed this action based on the Court's diversity jurisdiction. Plaintiff seeks $2.75 million [2] from the estate as compensation for the alleged assistance he provided to the Bondi family in their initial efforts to assert their ownership rights over the painting; plaintiff contends he was promised monetary compensation in the event that the family's efforts succeeded and that by not paying him, defendants have been unjustly enriched.

At the outset, the Court has *sua sponte* reviewed whether it has subject matter jurisdiction over this matter. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young, Inc.,* 109 F.3d 105, 107–08 (2d Cir.1997) (citations omitted). It does not. This is perhaps most clear based on the representation that the settlement funds are being held in abeyance pending the outcome of this matter. (*See* Defs.' Reply Declaration of Jennifer Bloom, Esq. in Further Support of Defendants' Motion for Summary Judgment ("Bloom Decl."), Ex. 6 at 2, October 11, 2013, ECF No. 86 ("The existence of this case prevents the [e]state from distributing the [s]ettlement proceeds to the [e]state's beneficiaries . . . .").)

---

[1]. It is unclear based on the current record whether plaintiff and Ardith are still romantically involved. Such fact is irrelevant to the outcome of the pending motion.

[2]. In plaintiff's initial Complaint, he sought $4,750,000 (*see* Compl., Nov. 14, 2011, ECF No. 1), but he subsequently decreased his request.

■ The "probate exception" to this Court's jurisdiction "is an historical aspect of federal jurisdiction that holds 'probate matters' are excepted from the scope of federal diversity jurisdiction." *Lefkowitz v. Bank of New York*, 528 F.3d 102, 105 (2d Cir.2007) (citations omitted). The Supreme Court held in *Marshall v. Marshall*:

> [T]he probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court. But, it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.

547 U.S. 293, 311–15, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006); *see also Lefkowitz*, 528 F.3d at 106 (explaining that "so long as a plaintiff is not seeking to have the federal court administer a probate matter or exercise control over a *res* in the custody of a state court, if jurisdiction otherwise lies, then the federal court may, indeed must, exercise it.")

■ Put another way, if the estate's funds are in fact a *res* currently being held by state court, this Court lacks subject matter jurisdiction. *Compare Groman v. Cola*, No. 07 Civ. 2635, 2007 WL 3340922, at *3–6 (S.D.N.Y. Nov. 7, 2007) *with Marcus v. Quattrocchi*, 715 F.Supp.2d 524, 530–34 (S.D.N.Y.2010). For example, in *Lefkowitz*, the Second Circuit held that the court lacked subject matter jurisdiction over the following claims, *inter alia*, because the claims required the court "to assert control over property that remains under the control of the state courts:"

reimbursement for wrongfully withheld estate funds; damages for unjust enrichment insofar as defendants failed to distribute income held by defendants and the estate that allegedly belonging to plaintiff; and reimbursement of plaintiffs legal fees. *Lefkowitz*, 528 F.3d at 107.

Accordingly, for this reason alone—and this reason first—this matter must be dismissed.

Even if it is subsequently determined that this Court does have subject matter jurisdiction, based on the evidentiary record currently before the Court (and liberally construing plaintiffs papers, as he is representing himself *pro se* ), there additionally is no evidence in the record that the estate or its authorized representative—the actual defendants in this matter—ever promised plaintiff that they would pay him for his efforts.

Instead, this is a situation in which a good deed has gone unrecognized: plaintiff gratuitously assisted his girlfriend and her family in obtaining rights to "Portrait of Wally," but frankly never expected that they would succeed. Thirteen years later, the family settled for $19 million;[3] ex post, plaintiff believes he is entitled to a portion of that money. On occasion, certain individuals—as to which there is no evidence that they were authorized to act on behalf of the estate—have indicated a belief that some recognition of plaintiff's efforts is in order (though not required). While there is no question that plaintiff contributed to the family's recovery efforts, such fact alone is insufficient to provide a legal or equitable requirement for payment.[4]

---

**3.** The estate has approximately $11.5 million available to distribute after expenses and attorneys' fees are paid. (*See* Declaration of Andrew G. Hope, Esq. in Support of the Defendants' Motion for Summary Judgment ("Hope Decl."), Ex. 12 at 4, July 23, 2013, ECF No. 65.)

**4.** Plaintiff has submitted two different sets of opposition papers in response to defendants'

## I. FACTUAL BACKGROUND

The following facts focus on plaintiff's alleged contributions to the Bondi family's efforts to regain rights to "Portrait of Wally" (other facts in the submissions are irrelevant to the disposition of this motion). These facts are not in dispute unless otherwise noted; where they are in dispute, the Court has construed the facts in the light most favorable to plaintiff. *See Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir.2008) (citation omitted).

On December 24, 1997, *The New York Times* published an article about "Portrait of Wally." (*See* Hope Decl., Ex. 24.) Soon thereafter, Henry Bondi (hereinafter, "Henry"), who is the nephew of Lea Bondi Jaray, spoke with his niece, Ardith Bondi (hereinafter, "Ardith") about reclaiming ownership rights over the painting on behalf of the family. (*Id.*, Ex. 8 at 8.) Later that day or the next day (the record is unclear as to the precise timing), Henry spoke with Willi Korte, a Holocaust art restitution specialist, about the family's possible ownership claim. (*Id.*, Ex. 9 at 9.)

On December 27, 1997, Henry requested that Ardith, a resident of New York State,

write letters to Governor George Pataki and Senator Alphonse D'Amato asking them to help keep the painting in New York State (where it was temporarily displayed) pending a determination as to ownership. (*Id.*, Pl.'s Notice of Motion ("Pl.s' Mot."), Ex. 1A at 1, Sept. 18, 2013, ECF No. 80.)[5] Ardith agreed to help and, in turn, enlisted the help of her then-boyfriend, plaintiff Robert ("Bob") Roistacher. (Hope Decl., Ex. 8 at 9.) (Ardith did send letters to Governor Pataki and Senator D'Amato, but to no avail.)

On December 30, 1997, at the alleged urging of plaintiff, Henry sent a demand letter to MoMA asserting ownership rights over the painting (*see id.*, Ex. 9); on January 3, 1998, a MoMA representative responded that MoMA was under a contractual obligation to return the painting to the lender and that it intended to do so on or soon after January 8, 1998. (Pl.'s Mot. Ex. 2.)

On January 4, 1998, plaintiff proposed that he call the New York County District Attorney's Office to speak with someone about the Bondi family's claim;[6] plaintiff received authorization from the family and

---

motion for summary judgment. In their reply, defendants note that they responded to plaintiff's later-filed submission. (*See* Bloom Decl. at 3.) However, in an effort to liberally construe plaintiff's papers—and because the submissions contain different materials—the Court considers *both* of plaintiff's submissions in connection with the pending motion. Defendants' submissions address the arguments and evidence contained therein.

5. The Court uses the page and exhibit numbers provided by plaintiff in citing to Plaintiff's Notice of Motion. However, given the inconsistent numbering of Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, the Court uses the electronic case filing system ("ECF") page numbers when citing to the materials contained therein.

6. Plaintiff had interviewed then-District Attorney Robert M. Morgenthau several times while working a journalist and believed "that Morgenthau would probably be about the only district attorney in the world that would take such a complaint seriously and act on it." (Pl.'s Mot., Ex. 22 at 15.) Plaintiff explained during his deposition his belief that Morgenthau had "an expansive view of his office such that he would be someone who could investigate a crime in Vienna in 1939 ... if he wished to do it." (*Id.; see also* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Mem."), Ex. 1 at 1, Aug. 16, 2013, ECF No. 74; Pl.'s Mot., Ex. 15 at 2.) Plaintiff also explained at his deposition that he had a neighbor who was an alumnus of the District Attorney's Office, with whom he spoke prior to the call. (Pl.'s Mot., Ex. 22 at 17.)

on January 5, 1998, he made the call.[7] (*See* Pl.'s Mem. at 5, 45, 79, Ex. 1 at 1–4.) Two days later, on January 7, 1998, the District Attorney's Office subpoenaed the painting as a potentially stolen artwork. (Hope Decl., Ex. 22.)[8] According to plaintiff, his January 5, 1998 call resulted in the subpoena being issued—the individual at the District Attorney's Office with whom plaintiff spoke later wrote plaintiff an email giving full credit to plaintiff for bringing the issue to the attention of the Office. (*See* Pl.'s Mem. at 38.)[9]

Following the subpoena, plaintiff helped the Bondi family find a lawyer. He obtained a referral for an attorney, Neil Getnick, and on January 11, 1998, plaintiff, Ardith, Henry, and plaintiff's brother-in-law, an attorney named Steven Polan, participated in an initial call with Getnick. (Pl.'s Mot., Ex. 4; *see also* Hope Decl., Ex. 8 at 15 (explaining that Polan's legal background equipped him with certain expertise in selecting attorneys).) The following day, January 12, 1998, Henry, Ardith, and Ruth Rozanek (hereinafter, "Rozaneck")—another member of the family who was involved—requested that Getnick submit a proposed retention agreement; the family executed the agreement soon thereafter. (Pl.'s Mot., Ex. 4.)

At some point in early 1998, the Bondi family also met with another attorney, Lawrence M. Kaye, a partner at Herrick, Feinstein LLP. (*See* Pl.'s Mem. at 76.) Plaintiff claims that he was instrumental in arranging this meeting (*id.* at 29), though plaintiff himself provides a declaration from Polan (his brother-in-law) which suggests that Polan (not plaintiff) knew Kaye and arranged the meeting. (*Id.* at 76; *see also* Hope Deck, Ex. 8 at 15.)

In March of 1998, the Bondi family terminated its relationship with Getnick and retained Kaye. (Pl.'s Mot., Ex. 5.) Plaintiff claims that he provided advice on the terms of the Herrick retainer; he says that Ardith provided his comments to defendant Andre Bondi, the current ancillary administrator of the estate, "without reference to their origin." (Pl.'s Mot. at 6.) Ardith corroborated this fact during her deposition, when she testified that she asked plaintiff to review and comment on the retainer at the request Rozanek and perhaps other family members as well. (*Id.,* Ex. 22 at 12.)

Plaintiff alleges that in exchange for the various services that he provided the Bondi family during the initial months of what would become a decade-plus battle[10]—which plaintiff contends dramatically altered the viability of the family's claim—plaintiff was promised compensation by certain family members in the event that the family's efforts prevailed. (Pl.'s Mem. at 13–16, 19–20; Pl.'s Mot. at 2.) Plaintiff

---

7. There is some evidence in the record that this call occurred January 3 or 4, but both such dates fell on the weekend in 1998.

8. While the New York Court of Appeals later quashed the subpoena, the U.S. Government immediately thereafter issued a warrant for its seizure and on September 22, 1999, initiated forfeiture proceedings to determine the identity of the painting's proper owner.

9. The contents of this letter are in fact hearsay (they are offered for the truth). While it might be possible for plaintiff to call a witness at a trial to testify as to the importance of his role in the subpoena process, it is unclear if he has listed any such individual on his Rule 26 disclosures (or elsewhere). In any event, for purposes of resolution of this motion, the Court assumes evidentiary issues would be overcome—the letter does not alter the ultimate result herein.

10. There is some general evidence in the record to suggest that plaintiff continued to play a role in the family's efforts at least into the summer of 1998—but not beyond. (*See, e.g.,* Pl.'s Mem. at 74; Pl.'s Mot., Ex. 6A, 16, 17.)

never asserts *defendants* (that is, the estate) ever made him such a promise.

Defendants argue that plaintiff's claim for unjust enrichment must fail because, put simply, equity does not require it: defendants were not enriched at plaintiff's expense and the manner in which defendants were enriched was not unjust. (Def.'s Mem. at 13–16.) Defendants argue that plaintiff's claims for payment for services provided are time-barred and otherwise insufficient because at the time plaintiff rendered his services, he had no expectation of compensation, did not perform services for or at the behest of defendants (but was rather helping out his girlfriend), and has, in any event, failed to demonstrate the reasonable value for his alleged services as required by the law. (Def.'s Mem. at 16–24.)

## II. LEGAL FRAMEWORK

### A. *Summary Judgment*

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.") (citation omitted). In making that determination, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v.*

*Napolitano,* 604 F.3d 732, 740 (2d Cir. 2010).

■ "If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. National Bd. of Medical Examiners,* 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1072 (2d Cir.1993)). "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation." *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 310 (2d Cir.2008) (citations omitted); *see also Opals on Ice Lingerie v. Bodylines, Inc.,* 320 F.3d 362, 370 n. 3 (2d Cir.2003) ("An 'opposing party's facts must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicions.'") (quoting *Contemporary Mission v. United States Postal Serv.,* 648 F.2d 97, 107 n. 14 (2d Cir.1981)).

■ A *pro se* litigant's filings must be read liberally and must be interpreted to "raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (citation omitted). "This precept is especially important in the summary judgment context, where claims are subject to final adjudication." *S.E.C. v. Mattera,* No. 11 Civ. 8323, 2013 WL 6485949, at *6 (S.D.N.Y. Dec. 9, 2013). " 'However, at some point in a lawsuit even *pro se* litigants must make clear to the court their claims and the facts that they believed entitle them to specific relief. The summary judgment stage is an appro-

priate juncture to identify the real issues in a case,' even where a party proceeds *pro se.*" *Id.* (quoting *Salahuddin v. Coughlin*, 781 F.2d 24, 29 (2d Cir.1986)).

### B. *Unjust Enrichment*

Following this Court's January 13, 2013 decision (*see* ECF No. 50), plaintiffs only remaining claim is for unjust enrichment. Construing plaintiff's papers liberally, plaintiff claims that defendants have been unjustly enriched insofar as the estate received the benefit of plaintiffs assistance without repaying him for such services; plaintiff also alleges that equity requires he receive payment because he contends that two members of the Bondi family, Ardith and Rozanek (neither of whom are defendants), told him he should be compensated in the event that the estate succeeded in its claims.

Under New York law, a plaintiff seeking damages for unjust enrichment must allege (1) that the defendants were enriched or benefitted, (2) at plaintiff's expense, and (3) that equity and good conscience require restitution. *Golden Pacific Bancorp v. F.D.I.C.*, 273 F.3d 509, 519 (2d Cir.2001) (citations omitted); *see also Bigio v. Coca–Cola Co.*, 675 F.3d 163, 176–77 (2d Cir.2012) (citation omitted); *Paramount Film Distrib. Corp. v. New York*, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 (N.Y.1972). "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.' " *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir.2000) (citing *City of Syracuse v. R.A.C. Holding, Inc.*, 685 N.Y.S.2d 381, 381, 258 A.D.2d 905 (4th Dep't 1999)).

To the extent that plaintiff seeks to recover the reasonable value of the services he rendered (i.e., in quantum meruit) in connection with his unjust enrichment claim, plaintiff must establish: "(1) the performance of the services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services." *Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir.2005); *see also Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F.Supp.2d 403, 413 (S.D.N.Y.2011) (internal quotation marks and citations omitted).

"Although privity is not required for an unjust enrichment claim, a claim will not be supported if the connection between the parties is too attenuated." *Mandarin Trading Ltd. v. Wildenstein.* 16 N.Y.3d 173, 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104 (N.Y.2011). "It is not enough that the defendant received a benefit from the activities of the plaintiff; if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery." *Joan Hansen & Co. v. Everlast World's Boxing Headquarters Corp.*, 296 A.D.2d 103, 108, 744 N.Y.S.2d 384 (1st Dep't 2002) (quotation marks and citation omitted). There must be indicia of "a relationship between the parties that could have caused reliance or inducement." *Mandarin Trading Ltd.*, 16 N.Y.3d at 182, 919 N.Y.S.2d 465, 944 N.E.2d 1104.[11]

### C. *Authority to Bind an Estate*

In order to make a binding promise on behalf of an estate, the promisor

---

11. Unjust enrichment claims in New York have a six year statute of limitations. *Golden Pacific Bancorp.*, 273 F.3d at 518. In a prior decision, this Court found that plaintiff's unjust enrichment cause of action accrued on the date of the settlement, because under plaintiff's theory, the settlement triggered a condition precedent to the promise. (1/10/13 Mem. Decision & Order at 7–10, Jan. 10, 2013, ECF No. 50, 2013 WL 123735.)

must be equipped with the proper authority: "There is no inherent right to administer. It is purely statutory." *In re Sorensen's Estate*, 195 Misc. 742, 91 N.Y.S.2d 220, 223 (N.Y.Sur.Ct.1949). In New York, the New York Surrogate's Court Procedure Act carefully outlines the procedures required in order to obtain such authority. *See* N.Y. Surr. Ct. Proc. Act. §§ 1001–07 (McKinney 2013) (explaining the way in which an estate's administrator is appointed); *In re Coleman's Estate*, 150 Misc. 76, 269 N.Y.S. 617, 619 (N.Y.Sur.Ct.1934).

■ If an individual acts on behalf of an estate without the proper authority, that agreement may be deemed unenforceable and/or the promisor may be deemed personally liable for such commitment. For example, in *In re Bigler's Estate*, the Surrogate's Court held that a third person who did not have the authority to bind the estate—even though she was a relative of the decedent—could not promise a sum of money to be paid by the estate; to the extent that such agreement was made, it was unenforceable. 35 N.Y.S.2d 658 (N.Y.Sur.Ct.1942). As another example, in *In re Cohen's Estate*, the Surrogate's Court held that the father of the decedent acted improperly by administering funds on behalf of the estate prior to letters of administration on the estate being issued; the court required him to repay the estate's administrator the funds that he had administered without authority. 206 Misc. 271, 132 N.Y.S.2d 749, 751–52 (N.Y.Sur.Ct. 1954); *see also In re Ranney's Estate*, 78 N.Y.S.2d 602, 604–05 (N.Y.Sur.Ct.1948) (explaining that a nominated executrix "who, to the extent that she acts with respect to the estate assets," is impermissibly meddling).

## III. DISCUSSION

Even liberally construing plaintiff's submissions, no fact-finder could reasonably determine that plaintiff relied on a promise of payment from *defendants.* that is, the estate, in exchange for providing his assistance in 1998. Instead, the record is clear that the estate at no point promised plaintiff compensation; there is no evidence that the services were induced based on promises of payment or that plaintiff ever relied on a promise of payment. The only reasonable inference is that plaintiff was doing his girlfriend a favor—he acted kindly, but gratuitously.

### A.  *Plaintiff's Claim Based on Generalized Unjust Enrichment*

■ Courts have made clear that "a plaintiff[ ] cannot maintain an unjust enrichment claim for the return of funds in which [he] had no possessory interest." *Reed Int'l Trading Corp. v. Donau Bank AG*, 866 F.Supp. 750, 757 (S.D.N.Y.1994). In this case, plaintiff has never had a possessory interest in the estate's funds—he did not advance any money to further the estate's cause (*see* Bloom Decl., Ex. 11 at 170), nor does he hold an ownership interest in "Portrait of Wally." Moreover, and as noted by defendants in their papers, the estate has been enriched with the settlement, but not unjustly—the funds are the product of a long and hard-fought legal battle (with which plaintiff actually had a very little to do in the long term). Accordingly, he cannot maintain a claim for unjust enrichment based on an interest in the estate itself.

### B.  *Plaintiff's Claim Based on the Services He Provided*

■ Similarly, there is no triable issue regarding the circumstances under which plaintiff provided services to the Bondi family—he did so gratuitously. Plaintiffs own testimony makes clear that he never relied on a promised payment in consideration for rendering his services; plaintiff

had no expectation of payment, contingent or otherwise, in exchange for his assistance.

### a. *The alleged promises to plaintiff*

During the time he provided help to the Bondi family, plaintiff never demanded payment or conditioned his services on payment were there to be a successful outcome.[12] (Hope Decl., Ex. 7 at 24, 32–33: *see also id.*, Ex. 8 at 7, 19; Ex. 10 at 11–13, Ex. 13 at 3a.) Plaintiff concedes that he did not personally request payment from Henry, Edith Southwell, or Andre Bondi for 12 years following his initial call to the District Attorney's Office.[13] (*Id.*, Ex. 8 at 7; Ex. 7 at 34.)

There is no evidence elsewhere in the record that plaintiff ever had an expectation of compensation for the assistance he provided. When asked plainly whether he expected compensation for his services, plaintiff responded: "Did I expect? I didn't expect that—I had no expectation

that it would succeed, so *I had no expectation that I'd be compensated.*" (*Id.* at 34; *see also* Pl.'s Mot., Ex. 25 at 3 (emphasis added).) Plaintiff's ex post assertion of an expectation of payment is based on argument only—the evidence is to the contrary. That plaintiff now wants to be paid is clear; that plaintiff never relied on or had an expectation of payment in 1998 is equally clear.

Further undermining plaintiff's position is that he concedes he "might have conferred a *gift* of services upon his friend Ardith Bondi...." (Pl.'s Mem. at 31 (emphasis added).)[14] Plaintiff argues that despite this fact, "he had no relationship with any other members of the Bondi family" and "[t]he services were in fact meant for the benefit of the [e]state and nothing suggests a gift thereto." (*Id.*) In the absence of any proof that the estate agreed to pay him in exchange for his services, plaintiffs statement regarding conferring a gift to Ardith negates plaintiffs *post hoc*

12. Plaintiff testified at his deposition as follows:

Q: Did you tell [Ardith or Rozanek] that you wanted $4,750,000 for your alleged services?
A: Never.
Q: Did you tell them that you wanted 25 percent of the money received?
A: No.
Q: Did you tell them you wanted $2,475,000 for your alleged services?
A: No.
Q: Did you tell them you wanted 15 percent of the money they received?
A: No.
Q: So you're not claiming that you actually went to them to demand payment, correct?
A: Yes, that's correct.
Q: Is it your position that at no time did you ever demand payment from either or both Ardith Bondi and Ruth Rozanek?
A: That's correct. I never demanded payment from either of them.
Q: Did you ever tell Ardith Bondi that you would not provide any of your alleged services unless you were paid?

A: No.
(Hope Decl., Ex. 7 at 32–33.)

13. Plaintiff wrote Andre Bondi a letter on August 29, 2010 demanding payment, but he testified that prior to that letter, he had never demanded payment from the estate. (*See* Hope Decl., Ex. 7 at 34–35.) While at one point in the deposition transcript there is a reference to this letter being sent in 2000 rather than 2010, this appears to be a typographical error. (*Id.*)

14. Plaintiff provided the following testimony at his deposition:

Q: And when your girlfriend asked for help in 1997 and 1998, you did not say to her, I'll help you only if you pay me, correct?
A: That's correct.
Q: Or only if I were to be paid, correct?
A: That's correct.
Q: Did you ever tell Ruth Rozanek that you would not provide any of your alleged services unless you were paid?
A: No.
(Hope Decl., Ex. 7 at 33.)

claim that he expected the estate to compensate him.

At their depositions, both Rozanek and Ardith testified that they never promised plaintiff compensation on behalf of the estate for his efforts. (Hope Decl., Ex. 10 at 11, Ex. 8 at 17.)[15] In response, plaintiff produces evidence that suggests Ardith and Rozanek told plaintiff that they believed he should receive a financial recognition for his assistance.[16] For example, in a June 27, 2011 email from Ardith to Southwell, Ardith stated: "One more thing to keep in mind, Edith. Ruth Rozanek and I told Bob at the time he made the call to the DA for the family that if we succeeded in the case, he would receive something from the estate. Ruth still reiterates the same thing." (Pl.'s Mem. at 42; *see also* Pl.'s Mot. at 2.) Similarly, Ardith stated in a February 27, 2012 declaration: "Andre [Bondi] and Edith[ ] [Southwell's] appointments as Administratrix and Ancillary Administrator of the [ ] estate were only in 2000, long after Rozanek and I, along with Henry, had represented the estate, when we had promised Roistacher that he would deserve something from the Estate's proceeds, if we were successful." (Pl.'s Mem. at 17; Pl.'s Mot., Ex. 1A at 4.) These statements are inapposite, however, because the record is clear that neither Ardith nor Rozanek were with equipped with proper authority to bind the estate.[17] *See* N.Y. Surr. Ct. Proc. Act. §§ 1001–07 (McKinney 2013); *In re Coleman's Estate*, 150 Misc. 76, 269 N.Y.S. 617 (N.Y.Sur.Ct. 1934).

To the extent that plaintiff argues he was misled by Ardith and/or Rozanek insofar as they misrepresented the extent of their authority (which would require more than the standard liberal reading of plaintiffs papers), plaintiff has no viable claim against the estate. His claim would be against Ardith and/or Rozanek in their individual capacities.

Further illustrating the void of any factual issue is that the record suggests the issue of compensation was first raised *after* plaintiff had already provided the bulk of his services—in February or March 1998.[18]

15. According to defendants, plaintiff voluntarily chose not to attend either of these depositions, despite repeated reminders and proposed accommodations by defendants. (Hope Decl. ¶¶ 17–19 ("Plaintiff withheld notifying [d]efendants of his decision not to appear until immediately prior to the depositions."))

16. There is no allegation that plaintiff believed Ardith had the authority to bequeath funds on the estate's behalf at any time. To the extent that plaintiff does claim Rozanek had such authority in the late 1990s, such allegation is unsupported by any evidence in the record; moreover, there is no evidence that Rozanek ever actually made such a promise on behalf of the estate (and indeed, lacked the authority to do so). (*See infra.*)

17. The Court also notes that it is undisputed that plaintiff played a large role in drafting the email that Ardith ultimately sent to Southwell. (*See* Hope Decl., Ex. 8 at 20, Ex. 20.) Separately, Ardith testified that neither she nor Rozanek promised plaintiff compensation on behalf of the estate. (*Id.*, Ex. 8 at 20–21.) The contrast between these positions and that discussed above does not create a triable issue of fact because as a matter of law (as discussed), neither Ardith nor Rozanek had the power to bind the estate.

18. While the operative Complaint asserts that the alleged promise was made in January 1998 (though there is no evidence as to when, and the Morgenthau phone call was in the first few days of the month), plaintiff testified under oath at his deposition that he was first promised compensation in February or March 1998. (*See* Hope Decl., Ex. 7 at 31.) *See AB v. Rhinebeck Central School Dist.*, 361 F.Supp.2d 312, 316 (S.D.N.Y.2005) ("Faced with deposition testimony that contradicts an affidavit and a complaint, this court must accept [plaintiff's] sworn testimony."). The Court does note, however, that this testimony may have been given with the understanding that defendants' lawyers were inquiring only

(*See* Hope Decl., Ex. 7 at 31.) Plaintiff alleges that the first time Ardith promised him payment was over the phone, when she said: "Ruth [Rozanek] and I feel that if we're successful in this, that the estate should pay you something." (Hope Decl., Ex. 7 at 27, 31.) In response, plaintiff said: "That would be nice, it would be appreciated[,] and I wouldn't say no." (*Id.* at 32.) By plaintiff's own recollection, Ardith said she thought the estate *should* pay him, not that it would (and Ardith made such statement after the call to Morgenthau).

Similarly, plaintiff testified at his deposition that when he spoke with Ardith in preparation for his deposition, Ardith reminded him "that sometime ... soon *after* I had made a complaint to the district attorney, during the course of those months, that she had had several conversations with [Rozanek] and that together they decided that just in case there was success in this for the things I had done for them that I should receive some benefit from the estate." (Pl.'s Mot., Ex. F at 1 (emphasis added).) Here again, plaintiff's own testimony suggests that the alleged promise was hopeful in nature and postdates the bulk of his services—on these facts, no reasonable fact-finder could determine that plaintiff was, in fact, prom-

ised compensation in the event of a successful outcome for the estate.

Moreover, a number of statements cited by plaintiff in his papers suggest that Ardith and Rozanek believed plaintiff was deserving of some payment, not that the estate had committed to pay him.[19]

For example, following the settlement, in February 2011, Rozanek sent an email to defendant Andre Bondi that stated: "I do agree to a certain extent with Ardith in that Bob was the first one to bring the case to Morgenthau. I really do not want to go into the entire story again ... but as a nuisance issue as well as a justice problem. I think an arrangement should be made to compensate Bob to a relatively small extent. I would certainly agree to give some of my money (if I ever get it) to Bob and resolve this by according him around $25,000.00 (not necessarily the $50,000.00 Ardith wants). I think that in all fairness there should be some compensation for his efforts." (Pl.'s Mem. at 45; *see also* Pl.'s Mot., Ex. 23.)[20] Here, Rozanek suggests that plaintiff *should* be compensated (perhaps using the family member's individual recoveries); she does not state that plaintiff was promised by the estate that he would be.[21]

b. *Reasonable Compensation*

■ Separately, plaintiff has failed to provide a reasonable explanation of the

about the time period after which he had recommended various lawyers to the Bondi family. (*See* Hope Decl., Ex. 7 at 30.)

19. On May 10, 1998, Rozanek wrote to Ardith via fax: "I am not unaware of the debt we owe Bob and I will not forget it." (Pl.'s Mot., Ex. 1A at 4, Ex. 21.)

20. Ardith stated: "But my opinion of what he did that was so absolutely critical was that, because it kept the painting here, and nothing else kept the painting here. And then he brought in the two attorneys, one of which helped the case to the end." (Pl.'s Mot., Ex. 22 at 21.)

21. Plaintiff also relies on a June 2011 email where plaintiff asks Ardith to confirm whether Rozanek recalled "having promised that [plaintiff] could expect to receive compensation just in case a successful outcome was obtain[ed]" and Ardith responding that Rozanek recalled it, "and she still says it, only her concept of how much you should receive is outdated." (Pl.'s Mem. at 23, 41.) This email does not specify whether the funds were to be paid by the estate or by Ardith and Rozanek as individuals, however, and given the other evidence in the record, is not sufficient to create a question of fact in this matter.

compensation to which he claims entitlement. Accordingly, even if this Court were to find in favor of a quantum meruit payment, a hearing would be needed as to amount.

Plaintiff testified at his deposition that his basis for compensation is that he typically charges clients 15% commission when he works as their literary agent. (Pl.'s Mem. at 26.) Plaintiff said "[h]e assumed the usual terms of work associated with his practice: no payment for services without success; payment upon success. All income came from commissions." (*Id.*) However, when asked to explain his rationale with greater specificity, he stated:

> I think it represented a confluence of the rate that I, as an agent, am used to taking on the gross—on gross receipts. And also that it's in line with the fees that heir finders take, which also is consistent with—with what state law is on lost property, on a fee for finders of lost property.

(Hope Decl., Ex. 7 at 16–17.) When pushed, he agreed that none of the services he provided involved finding heirs and that he himself did not find actually find any lost property. (*Id.* at 16–18.) He also had admitted earlier in his deposition that the services he provided were not literary agent services (*id.* at 15) (though in his opposition papers, plaintiff argues that the services he provided were a logical extension of his work as a literary agent). Accordingly, there is also insufficient evidence in the record as to rate and no evidence as to how—even if this Court were to find payment owed—any rate or amount should be calculated.

## IV. CONCLUSION

The doctrine of unjust enrichment is rooted in notions of equity and fairness. While plaintiff may think it is unjust that he was never compensated for the help he provided to the Bondi family, at the time he provided assistance, he was acting gratuitously (i.e., providing assistance to his girlfriend and her family), had no expectation of recovery, and was not promised compensation by the estate.

There is therefore no legal basis to require the estate to pay plaintiff. Some payment—in recognition of the favor plaintiff did and the impact it may have had—would be, in this Court's view, morally appropriate. Given the history of this painting, recognizing the morally correct course has significance. Receipt of value for the asset wrongly taken by the Nazis should be untainted; the beneficiaries of the estate have the ability to rectify this situation. This Court does not.

This case is DISMISSED for lack of subject matter jurisdiction, with leave to re-file in Surrogate's Court. To the extent it is determined that this Court has subject matter jurisdiction, this Court GRANTS summary judgment for defendants.

The Clerk of Court is directed to terminate the motions at 64 and 80 and to terminate this action.

SO ORDERED.